BONSACK MACH. CO. v. ELLIOTT.

BONSACK MACH. CO. et al. v. NATIÓNAL CIGARETTE & TOBACCO CO. et al.

(Circuit Court of Appeals, Second Circuit. June 28, 1895.)

1. PATENTS—CIGARETTE MACHINES.
   The Hook patent, No. 184,207, for a cigarette machine, covers a patentable and primary invention, and its second claim is infringed by a machine made in accordance with reissue No. 11,104, to Robert Hardie, assignor to Henry C. Elliott. 63 Fed. 835, affirmed.

2. SAME.
   The Emory "belt patent," No. 216,164, for a cigarette machine, construed, and *held* not infringed as to claims 10, 12, 14, and 15, by the Elliott machine (reissue No. 11,104). 63 Fed. 835, reversed.

3. SAME.
   The Bonsack patent, No. 238,640, for a cigarette machine, construed as to claims 6 and 7, and the same *held* not infringed by the Elliott machine (reissue No. 11,104). 63 Fed. 835, reversed.

4. SAME.
   The Emory "packing-bar" patent, No. 308,556, for a cigarette machine, construed as to claims 1 and 2, and the same *held* infringed by the Elliott machine (reissue No. 11,104). 63 Fed. 835, affirmed.

Appeal from the Circuit Court of the United States for the Southern District of New York.

These were suits in equity by the Bonsack Machine Company against Henry C. Elliott and by the Bonsack Machine Company and the American Tobacco Company against the National Cigarette Company and others, for infringement of four patents for cigarette machines. In the circuit court, certain claims of each patent sued on were sustained, and found to be infringed, and a decree was entered for complainants accordingly. 63 Fed. 835. Defendants appeal.

Duncan & Page, M. B. Phillipps, A. H. Burroughs, and W. W. Fuller, for complainant.

Glenn & Manley, Mr. Baldwin, and Mr. Watson, for defendants.

Before BROWN, Circuit Justice, and LACOMBE and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. The Bonsack Machine Company brought a bill in equity in the circuit court for the Southern district of New York against Henry C. Elliott, which charged infringement of four letters patent for cigarette machines, viz.: No. 184,207, granted to the assignees of Albert H. Hook, on November 7, 1876; No. 216,164, granted to Charles G. Emory and William H. Emory, on June 3, 1879, and known as the "Emory belt" patent; No. 238,640, granted to James A. Bonsack, on March 8, 1881; and No. 308,556, granted to Charles G. Emory, on November 25, 1884, and known as the "packing-bar" patent. Upon proofs taken for "final hearing," the circuit court granted an injunction against the infringement of the second claim of the Hook patent, of the tenth, twelfth, fourteenth, and fifteenth claims of the Emory belt patent, of the sixth and seventh claims of the Bonsack patent, and of the first and second claims of the packing-bar patent. After this interlocutory decree, the circuit court for the same district, in the bill of equity of the Bonsack Machine Company and the American Tobacco Company, its licensee, against the National Cigarette & Tobacco Company and others, enjoined the defendants, pendente lite, against the infringement of the same claims of the Emory belt and Bonsack patents, by the use of the machine known as the "Baron Machine." The defendants in each case appealed from the respective decrees. The Hook invention, which was made in the early part of 1872, was for the manufacture of a "continuous" cigarette, of indefinite length, to be cut up, as it left the machine, into separate cigarettes of the ordinary length. Previously, cigarettes had been made singly by hand, and machines existed which were designed to manufacture them automatically in the same way. Hook's machine embodied the result of the first known attempt to manufacture a rolled and wrapped cigarette of indefinite length. It was never used to manufacture for sale, and probably never could have been a commercial success, but as a wrapping device it contained the rudimental mechanism which has reappeared in each of its successors. In this machine a ribbon of paper, as it was unwound from a spool, passed over a gum wheel, which placed a narrow streak of paste upon one edge of the lower side of the ribbon. Thence the paper passed into a

trough, which, starting from a flat surface, gradually curved more and more upward until it terminated in a tube former, and thus the paper was formed into a tube, which passed into and through a hollow cylinder, in which the two edges of the tube were made to adhere together. Before the ribbon was formed into a tube, a bucket wheel delivered tobacco upon the flat surface of the paper. The filler was thus made, and the wrapper was rolled about the filler simultaneously in the same trough or tube-forming die. The French patent of Abadie & Co., antedated July 10, 1874, was issued on October 5, 1874, and describes a mechanism which, like the Hook machine, was a commercial failure. The French machine contained a pump plunger, by means of which loose tobacco was compressed and moved onward through a metallic molding tube, which had an interior diameter equal to the thickness of the cigarette which was to be manufactured, and molded the tobacco into cylindrical form. It also contained a "helicoidal mold, which incloses the orifice of the molding tube, supports the paper in trough form, and also bends the paper into tubular form, with one edge of the band of paper overlapping the other so that the paper incloses the tobacco filler delivered by the forming tube." The operation of the various elements of the machine was described in another case by Mr. Edward S. Renwick, as follows:

"The said principal members of the Abadie machine are so combined that the band or strip of paper is drawn from the spool past the gum-wheel, and past the hopper and through the helicoidal mold, by whose action the ribbon, partially bent against the rounded side of the hopper, is formed into a tube, with one edge overlapping the other, and, simultaneously with these drawing and tube-forming operations, the tobacco is delivered in a regulated quantity, is compressed into a cylindrical filler, and is fed upon the band of paper during its formation into a continuous tube, the said band being gummed previously, and having its edges finally pasted together, and the continuous cigarette being wound on the reel."

The paper is gradually folded into a tube around the previously compressed filler, and, the edges of the wrapper having been gummed, the filler is enveloped, and the wrapper is pasted in the helicoidal mold. The Emory belt patent was an advance upon the Hook machine. It adopted the principle of forming the filler before beginning the wrapping operation. The filler was continuously formed, before it reached the wrapper, in an endless traveling belt, curved around the tobacco by the walls of a chamber through which the belt passes.

"This endless belt separates from the tobacco filler as it delivers it to the paper wrapper and disappears beneath the table, but, after the paper strip has been wrapped around the filler, and the overlapping edge pasted down, the belt, reappearing above the table, comes into action again, and is caused to encircle the sealed cigarette rod with a close frictional contact, by passing with it through a hollow cylinder or guide tube."

In the movement through this tube, the cemented edges of the wrapper are pressed together until the paste has set.

It was contended in the circuit court, and the court found, that a third and unpatented Hook machine, made prior to the date of the Emory invention, contained an endless ribbon, which was drawn through the machine under the paper ribbon, to support it, and re-

lieve it from strain. The circuit court therefore found the thirteenth claim of the Emory patent, which was for "an endless belt and a guide tube, whereby a continuous filler in a sealed wrapper is inclosed and carried forward," to be invalid. Upon this appeal, it is not necessary to determine the question of the existence of the third Hook machine as a completed mechanism.

The Bonsack machine is a commercially successful improvement upon the Emory belt machine, its main difference being that the belt, which underlies paper and filler, passes with both through the wrapping mechanism. The minor particulars, which are described in the claims which are in controversy, are improvements in the specific rolling and wrapping devices. An open trough, having side guides for the belt, receives the filler, and belt and tobacco and paper are conveyed into a former, which is a tapering tube having a spiral groove extending from one of the side guides to the end of the tube, when the edges of the tube lap past each other so as to form a flange continuous with the spiral groove. The object of these particular devices is to perfect the folding and wrapping mechanism so that the edges of the tube and the tube itself, while being pasted and folded, may be controlled and kept in place.

The invention described in the packing-bar patent consists, in the language of the specification, "in the combination with the filler-forming belt of a tamping and compressing bar, having vertical adjustment, and acting intermittently upon the tobacco, to tamp, compress, and pack the same within the upwardly curving belt at the point where it passes through the packing chamber, and previous to its entering the filler-forming tube."

The Elliott machine, which is the device alleged to be an infringement, is described in reissued letters patent No. 11,104, dated August 19, 1890, and issued to Robert Hardie, assignor to Elliott. It is a complex machine, and is described by Judge Wheeler, in his opinion in the circuit court, as follows:

"The stock for the filler is first deposited in a thin layer upon a feed table provided with a traveling feed belt. A blade then carries a row of the stock along the table toward jaws, between which the mass is clamped. A tongue then compresses the material between the jaws into a solid block or rod, against a support, the material being thus molded in a four-part mold, so that it forms a rod or section of the filler in its fully-compressed state before the application of the wrapper, thereby rendering unnecessary any further compression after the application of the wrapper. Meanwhile, the wrapper, in the form of a continuous strip, is bent to a U shape, transversely, and is then conducted with a traveling belt through a grooved support guide or receiving chamber, and the jaws then convey the rod to a position above the curved wrapper, and the tongue descends and moves the rod from between the jaws, discharging it into the wrappers, where, in some cases, it will expand slightly, the end of the rod overlapping that previously deposited, and the tongue pressing the overlapped portions together to form a continuous filler. The belt travels continuously, so that, while the tongue is in contact with the rod, the tongue and the receiving chamber travel longitudinally, together with the belt, wrapper, and rod; but, as soon as the tongue rises, the chamber and tongue move longitudinally back to their former positions. The wrapper and filler are then carried by the belt from the reciprocating chamber to a folding chamber, where one edge of the paper is turned in, the paste applied to the standing edge, and the latter is then turned down and secured, the belt conducting the wrapper and rod until these operations are accomplished, after which it is

deflected and the filled wrapper passes through a holder, which serves as a support, and as an edge, against which a revolving cutter shears the same into short sections or cigarettes. The tongue is given two principal motions, an up and down reciprocating motion between the jaws, and a longitudinal reciprocating motion with the receiving channel. The up and down motion serves to compress the tobacco into a rod, to clean the jaws, and force or deliver the rod of tobacco stock down into the receiving channel. The longitudinal motion is applied, and the tongue carried forward simultaneously with the receiving channel at the same time that such tongue is being forced between the grippers down into the receiving channel, 'giving it sufficient pressure at the lapping end to form with that portion which has passed forward in the channel a continuous cigarette rod.' The peculiar shape' and arrangement of the former in relation to the receiving channel and the paper ribbon, as it is fed off from the reel and passes below an adjustable roller, causes the paper ribbon to be evenly and neatly folded up in the U-shaped form shown in the receiving channel. It travels through the receiving channel with its edges under hooks, or turned down flanges of guides; and the ribbon is maintained in such shape with the tobacco rod resting in it throughout the length of the receiving channel, and until it is acted upon by beveled folding rollers above the folding channel. The tape is also folded into a U shape by the former, and travels through the receiving channel below the paper ribbon, so as to protect it and to assist in carrying it forward. After leaving the receiving channel, the paper ribbon is folded over, first at one edge, while the other edge is pasted, and then the pasted edge is folded over to form a complete wrapper for the filler rod, as heretofore described, with reference to the folding channel and its beveled rollers. As the wrapped and completed rod passes forward through a tubular holder in the cutter carriage, it is cut into cigarette lengths by a rotating cutter blade." 63 Fed. 838.

The only claim of the Hook patent which is in issue upon this appeal is the second, which is as follows:

"2. The combination of spool, A, gumming wheel, B, trough, C, cylinder, D, with a mechanism for charging with tobacco and drawing the ribbon, a, through the trough and cylinder, as set forth."

The elaborate effort of the defendant to show that the different elements of the Hook machine existed in scattered form in mechanism relating to arts remote from that of the formation of a continuous cigarette rod was superfluous. It is admitted by the complainant that each element per se was old, and it is practically admitted by the defendant that the combination of the several elements was new.

The question of the existence, in the Hook machine, of patentable invention, was also raised; but time was wasted in attempting to show that machines relating to diverse and nonanalogous arts, in which some sort of an envelope was wrapped around some sort of a core, prevented the exercise of invention in the formation of a previously unknown machine which could wrap loose tobacco in thin, delicate paper, and, by various molding and pasting devices, produce a continuous and usable cigarette rod. The Hook machine was a patentable and primary invention, and its wrapping mechanism exists, with many improvements, in the machines of the present day, and is found in the Elliott machine, which folds the paper ribbon in the general way which Hook crudely pointed out. But it is said that Hook's invention was a combination of means whereby the tobacco was deposited upon a slip of paper and drawn through a trough adapted to perform simultaneously the office of forming the filler and wrapping it in the paper, while the principle of Elliott's machine consists in forming the filler and wrapping it by separate opera-

tions. This is true, but the conclusion does not follow that Hook's trough, or any trough having its functions, has been dispensed with. Elliott does not use the original trough for both making and wrapping the filler simultaneously. He uses it simply for wrapping; and Hook's invention being a primary one, it is not vital, upon the question of infringement, that Elliott does not scatter the tobacco loosely upon the paper, but presents it to the paper in the form of a compressed filler. He uses the Hook wrapping device, although experience has taught the wisdom of not attempting to use it as a filler-forming device. We concur in the opinion of the circuit court that the second claim of the Hook patent was, during its lifetime, infringed.

The 10th, 12th, 14th, and 15th claims of the Emory belt patent are as follows:

"10. In combination with an endless belt, a filler-forming chamber, and a guide for applying a wrapper around a filler, a conductor or chamber through which the continuous filler and wrapper are conveyed to a suitable pasting device, whereby the swelling of the filler is prevented and the wrapper is held in form while the edges are secured by pasting, substantially as described."

"12. The combination of a gauge or former for uniting the edges of the wrapper with a paste supplying and distributing disk, and mechanism for operating the same, a guide for wrapping a wrapper around the filler, a filler-forming chamber, and an endless flexible belt, all to operate in a manner substantially as described."

"14. In combination with devices for forming a continuous cigarette of any desired size, an endless belt, a guide tube, and a delivery tube; whereby a continuous cigarette is presented to the action of suitable cutting mechanism for division into desired lengths, substantially as described.

"15. The combination of an endless belt and guide tube with a delivery tube and suitable cutting devices, whereby a continuous cigarette of any desired diameter can be advanced and severed into desired lengths, substantially as described."

The question of the infringement of the Emory belt patent is the one of most importance in the case and depends upon the construction which shall be given to the tenth and twelfth claims. The complainant considers that the essence of the combinations of these four claims is that the filler of the cigarette is formed in one set of devices and wrapped with the wrapper in another set of devices, and that the endless belt, as a carrier or conveyer, connects the two sets together, and therefore that the particular kind of filler-forming chamber is unimportant. If a machine has a filler-forming chamber and a guide for wrapping the filler, but has an endless belt connecting the two sets of devices, and a chamber which prevents the swelling of the filler, through which the filler, however formed, and wrapper, are conveyed to a pasting device, the tenth claim is, in the opinion of the complainant, infringed. This construction, as we understand, was substantially acceded to by the circuit court, and would seem to have strength, unless account is taken of the Abadie invention.

The French machine had separate devices for filler forming and wrapping, and the formed filler was led, upon the paper strip, during its formation, into a continuous tube, after it had been gummed, but before its edges had been pasted together. The essence of the Emory belt invention was disclosed by Abadie & Co. in an imperfect

form, the main defect being in the set of devices which formed and delivered the filler; but, in view of this machine, the Emory patent is not entitled to a broad construction, so as to include within its terms machines in which a filler, however formed, is delivered by an endless belt to a paper strip, to be wrapped, by the aid of a guide, and then passed through a pressure tube while being pasted. The Emory belt was not a mere carrier. It was continually a forming and encircling tube. An endless belt to serve simply as a carrier has a different character, and performs a different office, from the belt of the Emorys. The complainant's construction gives to its belt a scope wide enough to include a support which should do the simple work which the ribbon of the third Hook machine is said to have done. Such a construction gives to the patent a priority which it did not historically possess, improperly broadens the patentable character of the belt, and extends the control of the patent over all subsequently developed devices for the formation of a filler. The endless belt of the tenth and twelfth claims is curved, so as to compress the tobacco and form the filler, and the filler-forming chamber is one in which the filler is molded by the curved belt. The two claims are to be limited to the endless belt, which is curved transversely into tubular form, to constitute a mold, which compresses or molds the tobacco into a filler, and to the filler-forming chamber, which operates to bend or curve the belt into the tubular form,—not merely to enable it to receive or to carry, but to enable it to form a filler by the power conveyed by it. Neither the belt nor the filler chamber of the Elliott machine possesses these characteristics. The tobacco is clamped between jaws, and then compressed against a support into a compact block or rod. The jaws then convey the rod to a position above the previously curved wrapper, into which the filler is discharged. The fourteenth and fifteenth claims are for the minor details of mechanism by which the completed cigarette rod is presented to cutting mechanism. That it was to be drawn along and to be presented to cutting devices was shown in the Hook patent, and therefore the need of some sort of guide or delivery tube or conveying mechanism was obvious. If the claims for these minor and indispensable details disclose any patentable invention, they must receive a narrow construction, and be limited to the mechanism which is shown. In this event, the Elliott machine is not an infringement, for its grooved rollers are not the delivery tube of the Emorys; but we think that the claims do not contain any patentable improvement.

The Bonsack machine contained both the principle and the general method of construction of the Emory belt machine, but with improvements in detail which make it capable of producing a large and accurately made product; and it is therefore a commercially valuable machine. The sixth and seventh claims are as follows:

"6. In a cigarette machine which rolls a continuous cigarette in an endless belt by passing through a tapering tube, the combination of an open trough having side guides for the belt, a tapering tube having a spiral groove extending from one of said side guides and a terminal section to the tapering tube, having its edges lapped past each other, but not united, so as to form a

flange continuous with the spiral groove, substantially as and for the purpose described.

"7. In a cigarette machine which rolls a continuous cigarette in an endless belt by passing through a tapering tube, the combination of an opening trough having side guides for the belt, a tapering tube having a spiral groove extending from one of the side guides of the trough, and a terminal section having its edges separated to form a flange, b', to give access to the paste wheel and then closed again, as and for the purpose described."

In the Bonsack wrapping mechanism, the filler, paper, and belt pass from an open trough with overlapping edges, called "side guides," and which can hold down the edges of the belt, into a tapering tube, in which a spiral groove extends from one of these side guides, and as the edges of the end of the tapering tube lap over each other, the spiral groove terminates in what the sixth claim calls a "flange." The operation of this part of the mechanism is described in the patent as follows:

"Now, as the tobacco roll and paper strip pass on the belt into the trough, the curved edges of the latter give the incipient curve to the paper, and, after they have entered the tapering tube, the curving and wrapping of the paper around the roll proceed upon one side only, by reason of the spiral guide groove, a' (Fig. 8), for the edge of the belt. As soon as the complete circumference is made the guide groove, a', opens, in the form of a longitudinal flange or lip, b', which allows the upper or lapping edge of the paper to be exposed long enough to receive paste on its underneath edge from a paste wheel or brush (shown in Fig. 10), after which the tube closes again, as in Fig. 9, to force the pasted and lapping edge down upon the body of the cigarette."

The Elliott machine has no tapering tube having a spiral groove extending from one of the side guides of the open trough. It has an open trough with side guides for the belt, which is continued into a tube which is not tapering, and contains no spiral groove. The first and second claims of the packing-bar patent are as follows:

"1. In a cigarette machine, the combination, with a traveling filler-carrying belt and a packing chamber, of a tamping, packing, and compressing bar, and mechanism, substantially as described, for giving said bar intermittent action upon the tobacco, substantially as and for the purpose set forth.

"2. In a cigarette machine, the combination, with a filler-carrying belt and a packing chamber, of a tamping, packing, and compressing bar, and mechanism, substantially as described, for giving said bar motion toward and with the belt at intervals, substantially as and for the purpose set forth."

The molding device of the Elliott machine consisting of a tongue which compresses the tobacco, clamped between jaws, into a compact rod, which is then conveyed above the curved wrapper, and discharged into it, is an infringement of these claims. The bill in equity against the National Cigarette & Tobacco Company was brought after the expiration of the Hook patent, and did not allege an infringement of the packing-bar patent. The following description, in outline, of so much of the Baron machine as is important with reference to the tenth and twelfth claims of the Emory belt patent, and the sixth and seventh claims of the Bonsack patent, is condensed from the affidavit of Mr. Hannan, a former machinist of the defendant corporation:

"Directly beneath the hopper is placed a trough, in the bottom of which runs an endless conveyor belt, over pulleys. In front of the hopper are two pairs of horizontal grooved compressing wheels, one pair being set so that:

their peripheries are nearer together than those of the other pair. The conveyor belt runs beneath these wheels, in contact with the under side thereof, resting upon the upper side of the supporting table or bed. Immediately above these compressing wheels is located a short endless compressor belt, which passes over pulleys. The under portion of this belt runs in contact with the upper surfaces of the compressing wheels. The endless conveyor belt, which runs through the trough, receives the tobacco as it is discharged from the bottom of the hopper, and conveys it, between the two pairs of grooved compressing wheels, underneath the short belt, and then delivers it, fully shaped by the compressing wheels into the form of a rod, to the strip of paper to be wrapped. The folding and wrapping devices are as follows: The paper strip which is used for wrapping the filler is taken from a reel, below the bed of the machine, and is brought up through a guide slot, and then led into an open trough, so as to overlie a belt. The slots through which the belt and the paper strip thus pass are formed in small pieces of metal, which, by means of screws seated in the bed of the machine, are made laterally adjustable, independently of each other. These slots serve as side guides for the paper and the belt respectively. The trough, starting from nearly a flat form, has its sides gradually bent up and drawn in, until it takes on a U shape in cross-section. The first end of the tubular channel, which lies just beyond the trough, is provided with an overhanging hood, which is concave on its under side. One end of this hood is in contact with the grooved periphery of the guide wheel, the function of this guide wheel being to insure the proper introduction of the filler rod beneath this hood. This channel is tapering, vertically. A portion of the channel piece is gradually curved over, so as to overhang the channel in which the belt, the paper, and the tobacco are moving, so as to fold one edge of the belt and paper over, until they are taken by a wheel, which folds them over still further. Beyond the folding wheel lies the paste wheel, which delivers a film of paste upon the standing edge of the paper. The overhanging part of the channel piece continues to hold the first edge of the paper down in position on the filler, while the paste is being applied to the standing edge. Beyond the paste wheel, the standing edge of the paper and belt encounter a folding wheel, and are gradually turned over thereby, so as to overlap the first edge of the paper, which has previously been folded down into contact with the filler."

As the Emory belt patent has been construed, this machine does not infringe either of its claims. While it has the tapering tube, and may be considered to have the side guides, of the sixth and seventh claims of the Bonsack patent, it does not have the tapering tube having a spiral groove extending from one of the guides, or a flange continuous with a spiral groove, and does not infringe either of those claims.

The defendant in the Elliott Case moved the circuit court to strike out questions 10, 12, and 68 to 72, in the second deposition of H. F. Newbury, and the answers thereto, these questions and answers having been seasonably objected to before the examiner when the deposition was taken. The circuit court did not make any formal ruling upon the motion, but received the whole deposition. One of the assignments of error is that the court therein erred. The last paragraph of the answer to question 12, the second paragraph of the answer to question 69, the entire answers to questions 71 and 72 are inadmissible, because they are statements admittedly made from hearsay, and not from the knowledge of the witness. The attention of the bar of this circuit is again called to the inexpediency of allowing irrelevant matter in depositions in patent causes.

The interlocutory decree of the circuit court in the case against Henry C. Elliott is directed to be modified, without costs of this court to either party, so as to decree against an infringement only of

the first and second claims of patent No. 308,556, and to direct an accounting with respect to the infringement of said claims and of the second claim of the Hook patent, and to find that said three claims only have been infringed. The interlocutory order of the circuit court, pendente lite, in the case against the National Cigarette & Machine Company, is reversed, with costs of this court.