BONSACK MACH. CO. et al. v. SMITH et al.

(Circuit Court, W. D. North Carolina. September 28, 1895.)

1. PATENTS—INFRINGEMENT SUITS—EQUITY JURISDICTION.

The charge that the complainants in an infringement suit are endeavoring to secure a monopoly of the business to which the patent relates by means of purchases of other patents, numerous infringement suits (alleged to be frivolous and vexatious in many cases), compromises, and the like, creates no objection to the jurisdiction of a court of equity, and no defense to the suit, especially where the suit in question is neither frivolous nor vexatious.

2. SAME—INFRINGEMENT.

A machine which resembles a prior machine in a particular in which the patent sued on was designed to improve the latter does not infringe.

3. SAME—DURATION OF PATENT—EXPIRATION OF FOREIGN PATENT.

Under the Canadian statute of 1872, patents were granted for five years, with the privilege of extension for two periods of five years each on payment of an additional fee in each case. By an amendatory act, passed in 1883, it was declared that the "term limited for the duration of every patent" should be 15 years, but that the applicant might, at his option, pay the full fee for that term, or a partial fee for 5 years, or for 10 years, as he might choose; and that the patent should cease and determine at the end of those terms, respectively, unless, before the expiration thereof, the further fee was paid. The act declared that all patents previously issued should be deemed to have been granted for a term of 15 years, subject, in case a partial fee only had been paid, to determine on the same conditions as patents issued under the amended act. *Held,* that the amendatory act could not in any wise affect the date of expiration of an American patent, where a Canadian patent had been taken out under the statute of 1872; that where the patentee procured one voluntary renewal, and then al-

lowed the Canadian patent to expire, the term of the Canadian patent must be considered as a continuous one for the period of 10 years; and that the American patent must be held to have expired at the end of that time. Pohl v. Brewing Co., 10 Sup. Ct. 577, 134 U. S. 381, distinguished.

4. SAME.
Where a United States patent is limited by operation of law to the term of a foreign patent for the same invention, which patent was granted for a term of five years, renewable, at the option of the patentee, for two terms of five years each, by the payment of an additional fee, the burden of showing such subsequent renewal is upon the patentee.

5. SAME—CIGARETTE MACHINES.
The Bonsack patent, No. 238,640, for a cigarette machine, is not infringed, as to claims 6 and 7, by the Briggs machine (patent No. 512,151).

6. SAME.
Claim 8 of the Bonsack patent, No. 247,795, for a cigarette machine, is limited by its terms, and by reason of amendments in the patent office, to a machine in which the continuous cigarette roll is moved towards the rotary cutting disk, which cuts it into cigarettes of proper length; and is not infringed by the Briggs machine (patent No. 512,151), in which the cutting disk, with its carriage, by a reciprocating motion, is moved towards the cigarette roll. Reece Button-Hole Mach. Co. v. Globe Button-Hole Mach. Co., 10 C. C. A. 194, 61 Fed. 961, distinguished.

This was a bill in equity by the Bonsack Machine Company and the American Tobacco Company against W. F. Smith and Sterling Smith, copartners as W. F. Smith & Co., for alleged infringement of certain patents relating to cigarette machines.

Duncan & Page, A. H. Burroughs, and W. W. Fuller, for complainants.

Glenn & Manly and W. D. Baldwin, for defendants.

SIMONTON, Circuit Judge. The complainant the Bonsack Machine Company is the owner, as patentee and assignee, of patents alleged to have been infringed by the Briggs patent, used and operated by these defendants, the Winston Cigarette Machine Company, J. A. Vance, Brown Bros. Company, and the Liberty Tobacco Works, and also by J. A. Leach & Co. The American Tobacco Company is the licensee of the Bonsack Company, enjoying the exclusive use of its patents. The present suit is brought as a test case, involving and controlling all the others, which are either pending or threatened. It involves with them precisely the same issue, the infringement of the patents of complainants; and it presents an issue in which they have no concern,—that of res judicata as to the validity of the patents set up by complainants. This last issue will be separately considered hereafter. The present suit is an ordinary bill in equity, brought for the infringement of several United States patents relating to machinery for the manufacture of cigarettes. The complainants, in their bill, set up five patents, and allege that defendants have infringed them: (1) The Emery patent, No. 216,164, granted to Charles G. Emery, upon the joint application of himself and W. H. Emery, dated 3d June, 1879, known in this case as the "Emery Belt Patent." (2) The Emery patent, No. 231,779, granted to the same parties, 31st August, 1890, known in this case as the "Emery Two Belt Patent." (3) The Bonsack patent, No. 238,640,

granted to James A. Bonsack, 8th March, 1881, known in this case as the "Bonsack Patent." (4) The Bonsack patent, No. 247,795, granted to James A. Bonsack, October 4, 1881, known as the "Second Bonsack Patent." (5) The Emery patent, No. 260,959, granted to Charles G. Emery, on the joint application of W. H. Emery and himself, dated 11th July, 1882. Complainants took no testimony in regard to the alleged infringement of this last-mentioned patent, No. 260,959, and at the hearing withdrew from the case as well the patent known as the "Emery Two Belt Patent," No. 231,779, resting their case upon the other three patents above mentioned. The assignments in evidence show that the Bonsack Machine Company owned all these patents, and the record discloses the fact that the American Tobacco Company is its licensee. The infringement charged is the use by defendants of two cigarette machines made substantially in accordance with letters patent granted to W. C. Briggs, 2d January, 1894,—No. 512,151. The answer admits the use of this Briggs machine, made substantially in accordance with letters patent No. 512,151, as alleged in the bill, but denies any infringement. It charges that the patents of the Bonsack machines have expired by operation of law. It denies the equity of complainants, in that the Bonsack Machine Company has ceased to manufacture, sell, let, or hire any machines except for or to the American Tobacco Company, to whom it has granted an exclusive license; in that the complainants have conspired to maintain a close monopoly in the manufacture of cigarettes, and in accordance with this policy have organized a trust, syndicate, or close corporation to prevent rival manufacturers from making cigarettes, as one means to which end James Bonsack or the Bonsack Company have brought many frivolous and vexatious suits against their rivals, and compromising or buying them off, and keeping many suits open and undetermined,—all these with the object of deterring or defeating competition; that, fully to carry out this purpose, the Bonsack Company, in their contract with its co-complainant, not only gives them exclusive use of its machinery at a large royalty ($250,000 per annum), but also, by inserting a provision that the contract can be rescinded by the licensee whenever 100,000,000 of cigarettes are manufactured in any one year in the United States by competing companies, it has bound itself to use every effort to defeat competition with its co-complainant; that by these and other unlawful means the complainants have absorbed a great number of factories, consumers of leaf tobacco, have reduced the number of buyers on the market for this product, and control and fix its price; that a court of equity should not and will not aid complainants in the prosecution of these unlawful designs. The answer denies the right of complainants in any event to damages, for the reason that no notice was given to defendants of the existence of the complainants' patents, or of the infringement charged, and because of the failure of complainants to give notice on their machines of the number and dates of the patents.

The charge that the complainants are without equity, going, as it does, to the jurisdiction of the court, will be first discussed. He

who seeks equity must do equity. Whoso cometh into a court of conscience must come with clean hands. We look to the pleadings and facts of the case before us. The issues are these: Do the complainants hold letters patent of the United States giving them the exclusive right to make, vend, and use certain patentable devices? Have the defendants infringed the rights thus granted? If, in procuring these exclusive rights, or if in their exercise, the complainants have been guilty of fraudulent or improper conduct towards these defendants, the 'fundamental principles relied on would debar them of any relief in this court. But if, in the absence of these, it is sought to deprive them of their remedy for the infringement of their rights because of their motives in obtaining them, or of their motives in asserting them, such motives are not the subject of judicial inquiry. Strait v. National Harrow Co., 51 Fed. 819. "The rule that one coming into equity must come with clean hands is confined to the conduct of the party in the matter before the court, and not to matters aliunde. Courts of equity, as well as courts of law, will not refuse redress to the suitor because his conduct in other matters not then before the court may not be blameless. It is enough if the suitor shows that he has acted justly, fairly, and legally in the subject-matter of the suit." Beach, Eq. Jur. § 16, and cases cited. The iniquity must have been done to the defendant himself, and must have been done in regard to the matter in litigation. 1 Pom. Eq. Jur. 434. To the same effect, Ansley v. Wilson, 50 Ga. 418. Nor can it debar the complainants of their right to come into this court because they are engaged in securing a monopoly. The suit is for the vindication and protection of rights claimed under patent. Patent rights are essentially monopolistic. Not only is the monopoly given to the patentee by the sovereign power, but the courts furnish every facility for enforcing it. During the enjoyment of his monopoly he is in absolute control of it. A patent right is essentially monopolistic. To contracts granting the exclusive right to use or vend patented articles the general rule (forbidding contracts in restraint of trade) does not apply, however extensive, as to territory, in their scope, and however unlimited as to time. If the patent be a valuable one, self-interest may be relied upon as a motive strong enough to induce the owner to take himself, or to permit others to take, some steps towards introducing his invention into use. How far it will go depends upon the owner. His right to decide this question is not in the least circumscribed by the interests of the public in obtaining such machinery or invention, or any right to its use. He may keep such right himself, or may make the machinery or manufacture the patented article alone. He may permit others to share such right with him. He may allow them the exclusive right, and may retain none for himself. He can clothe them with all his rights. This all follows from and is founded upon the absolute and exclusive right which the owner of the patent has in the article patented. Having such right, he must plainly be permitted to sell to another the right itself, or to agree with him that he will permit

none other than such person to use it. That person need not agree to make the patented article or to sell it. It is a question solely for the parties interested. This right is necessary, in order that the owner of the patent shall have the largest measure of protection under it. Considerations which might obtain if the agreement were in regard to other articles cannot be of any weight in the decision of a question arising upon an agreement as to patented articles. Good v. Daland, 121 N. Y. 1, 24 N. E. 15; Bowling v. Taylor, 40 Fed. 404; Registering Co. v. Sampson, L. R. 19 Eq. 462; Machine Co. v. Morse, 103 Mass. 73; Fowle v. Park, 131 U. S. 88, 9 Sup. Ct. 658; Hulse v. Machine Co., 25 U. S. App. 239, 13 C. C. A. 180, 65 Fed. 864.

As a corollary from this it is clear that the patentee can secure and protect his monopoly in any lawful way, by suit against infringers, by purchase of conflicting devices, by compromise or arrangements with competitors when infringement may be doubtful. As he may share or sell his monopoly with another, so he may purchase the whole or part of another's monopoly to support his own. It is charged that the Bonsack Company has contracted with the American Tobacco Company, the other complainant, to secure it in the monopoly of cigarette manufacture; that to this end it has brought suits against every competitor, many of which are frivolous and vexatious, some of which have been compromised, and some are still open on the dockets of courts in other jurisdictions than this. It is as impossible as it would be improper to bring these new issues into this case, and, under cover of these proceedings, to investigate the merits, or to sit in judgment upon cases brought, pending, heard, and decided in other tribunals. The only questions this court can meet and decide are: Are these proceedings without merit, vexatious, oppressive, brought to deter competition unlawfully, or is it true, as alleged, that the defendant has infringed the patent rights granted to the complainant? The complainants come into court presenting the contracts of the government, which secure them a monopoly in the things patented. Surely they can seek the aid of the court in giving effect to that which the government has granted by protecting it from invasion. If they seek that aid upon frivolous grounds, without merit, clearly intended to annoy or oppress a competitor, making use of their great wealth to crush a worthy tradesman or manufacturer, the court has ample power to measure out to them fit punishment. The long investigation of the case at bar before the examiners, the great number of witnesses whose testimony is in this record, the exhaustive discussion of the patents in question by skilled experts on both sides, the protracted and able arguments of many counsel before the court, its own difficulty in reaching a conclusion, demonstrate that this case, at least, is neither groundless, vexatious, nor frivolous.

Cigarettes are not an article of prime necessity. Indeed, their use, if not always deleterious, can scarcely be said to be beneficial. The public mind has been aroused to the abuses following their introduction in immense quantities on the market, and many of

the states have enacted laws looking to their suppression. There can be no reason for the interference of the courts securing their uninterrupted manufacture, nothwithstanding the existence of patent rights. It may be true that by reason of the capital, resources, and monopoly enjoyed by complainants they in a manner command the market of leaf tobacco, and have reduced the number of individual buyers. But this is an advantage enjoyed by every large capitalist. Competition, it is often said, is the life of trade. But the effort of all competition is to drive out other competitors. Steamship Co. v. McGregor, 21 Q. B. Div. 552. Any interference by any department of the government with open competition in the markets would stifle trade, and finally drive out all competition. "If there is one thing which public policy requires more than another, it is that men of full age and competent understanding shall have the utmost liberty of contracting." Registering Co. v. Sampson, L. R. 19 Eq. 462, 465. This preliminary objection is overruled.

This brings us to the merits of the case. The infringement charged is in a machine for the manufacture of cigarettes,—the Emery patent, No. 216,164. Before an invention of Hook, cigarettes were made by hand. A short rectangular piece of paper is taken, and the requisite quantity of tobacco laid upon it. Then the paper and tobacco are rolled together approximately into a cylindrical form, the paper being secured either by slightly pasting the overlap or tucking in the ends. Machines had been invented which made them automatically in the same way. Hook conceived a device for making a continuous cigarette roll, and, after it is made, cutting it up into the required lengths. His was the first device in this direction. Roughly described, this was a machine in which a ribbon of paper, as it was unwound from a spool, passed over a gummed wheel, which placed a narrow streak of paste upon one edge of the lower side of the ribbon. Thence the paper passed into a trough, which, starting from a flat surface, gradually curved more and more upward until it terminated in a tube-forming die, or helicoidal mold. Thus the paper was formed into a tube, which passed into and through a hollow cylinder, in which the two edges of the tube were made to adhere together. Before the ribbon was thus formed into a tube, the tobacco was delivered upon the flat surface of the paper. The filler was thus made and the wrapper was rolled about the filler simultaneously in the same trough or tube forming the die. "It was never used to manufacture for sale, and probably never could have been a commercial success, but, as a wrapping device, it contained the rudimental mechanism which has reappeared in each of its successors." Machine Co. v. Elliott (U. S. Cir. Ct. App., 2d Circuit) 69 Fed. 335. Three of these machines were made; the first two of wood, the last of iron frame. The first was used in making cigarettes with granulated tobacco. As the paper was drawn through the machine by nippers, the strain was so great that any friction would tear it. And it was impossible to make cigarettes with long-fiber tobacco, the kind of tobacco used in cigarettes. To overcome this, in experimenting on the machine,—which, indeed, was always more or less experimental,

—a belt was introduced, upon which the paper was laid, and which passed through with the paper, thus greatly relieving the friction and strain. Hook's machine, as we have seen, was never used in manufacturing cigarettes for sale, and never, perhaps, could have been made a commercial success. But very many cigarettes were made upon one or other of them from time to time. They evidently were the first machines upon which tobacco was fed to a strip of paper of indefinite length, which was then drawn through a molding apparatus, and folded into a cylindrical form, pasted and sealed in this form, and delivered a continuous cigarette, ready to be cut—in fact, cut—into proper lengths. It was the pioneer. Hook's patent was in 1876. The machines made by him were experimented upon and changed in many parts. The belt was not used until after the patent was issued, and was not patented. The weight of the testimony shows that it was in use before 1879. In this year Emery took out his patent, No. 216,164, the one in question in this case. The purpose of his patent was to remove the difficulties which made the Hook device impracticable. The fundamental difference between the Hook device and that of Emery is this. The former fed the tobacco on the paper, and molded the tobacco into the form of a filler at the same point in his machine, and by the same devices that folded the lapping edges of the paper down upon the tobacco to form the seam. In the Emery patent the tobacco itself is first molded into a cylindrical form, and, when a rod of tobacco is thus formed, it is delivered upon the paper, which then is wrapped around it, pasted, and sealed. The continuous cigarette thus formed is passed under the cutting device, and the cigarettes delivered in proper lengths. Both the Emery machine and the Hook machine had each an endless belt, a helicoidal mold, and a pasting apparatus. In the Hook machine the belt was merely a carrier for the paper strip. In the Emery machine the first office of the belt was receiving, holding, and molding the tobacco into a rod. When the rod was formed, the belt left it, and went under the table, reappearing after the rod had reached the paper, and had been enveloped in it. Thereafter the belt acted as a carrier. The distinguishing characteristic of the Emery device was that the tobacco was molded into the filler form in one part of the machine, and, after a rod was thus formed, it was delivered in another part of the machine upon the paper, by a separate set of devices. The tobacco is fed from a feeding device on an endless belt lying upon a tapering channel or belt curve. It is then molded by its movement through this tapering channel or belt curve lying in the belt which is brought into an approximately cylindrical form, and thus partially compresses the tobacco. Then the tobacco, still in the belt, passes under a wheel, which compresses it still more, and packs it down within the belt so that it cannot escape over its sides. Then the complete rod is formed by the belt with the tobacco being drawn through a tubular passage. This rod having been formed, it is carried over to the paper strip upon which it rests, and is drawn with it through the helicoidal mold, the paper is gradually wrapped around the rod of tobacco, pasted, and pressed, so form-

ing the continuous cigarette. This preparation and formation of the rod of tobacco in one part of the machine, and enveloping it in the paper, folding, pasting, and pressing the paper with its fold in another part, is the feature which distinguishes the Emery device from the Hook machine. It is charged that the defendants' machine infringes this. In the defendants', or Briggs machine, there is an endless belt, on which is laid the paper strip. The tobacco is fed directly on the paper, which is carried by the belt during the whole operation of filling, forming, folding, pasting, and pressing. The tobacco thus lying in the paper is folded with it gradually into a cylindrical form, the process not being completed until the paper has been pasted and pressed. In this respect the Briggs machine resembles that of Hook in the particular which the device of Emery was intended to improve it. This essential difference between the work of the two machines prevents the idea of infringement. The learned and experienced expert for complainants, by a minute and ingenious discussion of the Briggs machine, has found resemblances and equivalents for many parts of the Emery machine. Some of his arguments are striking and plausible, but a careful examination of them has left the impression that they are not sound. The actual operation of that machine in the presence of the court developed the fact that the cigarette rod in the paper was not fully completed until the paper itself was folded and sealed.

### The Bonsack Patents.

The Bonsack patent No. 238,640 was granted for the term of 17 years from 8th March, 1881. The other Bonsack patent was granted for the term of 17 years, 4th October, 1881. On 23d September, 1880, Bonsack applied for and obtained in Canada a patent for the invention in the United States patent No. 238,640 for the term of five years. Canada Patent, No. 11,812. And on 16th July, 1881, he obtained in Canada a patent for the invention in United States patent No. 247,795 for the term of five years. Canada Patent No. 13,104. When these patents were granted in Canada, an act of 1872 was then in force, under which patents were granted for the term of five years, with the privilege of an extension for two periods of five years each upon compliance with a certain condition,—the payment of a further fee. Each of the Canada patents was renewed one such term. Neither was renewed for a third term. Both expired before this suit was brought. Each Canada patent is expressly for the term of five years, subject, however, to cease and determine and be null and void at the end of two years from its date unless the patentee shall within that period have commenced and thereupon shall continue to carry on the construction or manufacture of the patented invention in Canada; and further to be void if the patentee, after the expiration of 12 months from the date of his patent, imports or causes to be imported into Canada the invention for which the patent is granted,—that is to say, the patent granted for a term of five years is defeasible and made null and void upon certain conditions subsequent happening during the term. And on

or before the expiration of the term it can be extended an equal continuous duration upon payment of a certain fee, this privilege to be twice exercised. In 1883, after the grant by the United States of the Bonsack patents, an act was passed in Canada amending this act of 1872. Its terms are as follows:

"The term limited for the duration of every patent of invention issued by the patent office, shall be fifteen years; but at the time of the application therefor, it shall be at the option of the applicant to pay the full fee required for the term of fifteen years or the partial fee required for the term of five years or the partial fee required for the term of ten years. In case a partial fee only is paid, the proportion of the fee paid shall be stated in the patent and the patent notwithstanding anything therein or in this act contained, shall cease at the end of the term for which the partial fee has been paid, unless at or before the expiration of said term, the holder of the patent pays the fee for the further term of five or ten years, and takes out from the patent office a certificate of such payment to be attached to or to refer to such patent. * * * And in case such second payment, together with the first payment makes up only the fee required for ten years, then the patent, notwithstanding anything therein or in this act contained, shall cease at the end of the term of ten years unless at or before the expiration of such term the holder thereof pays the further fee required for the remaining five years, making up the full term of fifteen years and takes out a like certificate."

The act then adds these words:

"Every patent heretofore issued by the patent office in respect of which the fee required for the whole or for any unexpired portion of the term of fifteen years has been duly paid according to the provisions of the now existing law in that behalf has been and shall be deemed to have been issued for the term of fifteen years, subject in case a partial fee only has been paid, to cease on the same conditions on which patents hereafter issued are to cease under the operation of this section."

Section 4887 of the Revised Statutes of the United States has this provision:

"No person shall be debarred from receiving a patent for his invention or discovery, or shall any patent be declared invalid by reason of its first having been patented or caused to be patented in a foreign country, unless the same has been introduced into public use in the United States for more than two years prior to the application. But any patent granted for an invention which has been previously patented in a foreign country, shall be so limited, to expire at the same time with the foreign patent or if there be more than one, at the same time with the one having the shortest term, and in no case shall it be in force more than seventeen years."

The defendants contend that under the operation of these laws both of the Bonsack patents have expired. The question is as to the construction of this section 4887. The manifest purpose of this section is to protect the people of the United States. When the same article has been patented abroad, and afterwards in this country, and by the expiration of the term of the foreign patent its use becomes unrestricted abroad, the monopoly privilege in this country is revoked, and its use by our people is equally unrestricted; or, as it is expressed in Refrigerating Co. v. Sulzberger, 157 U. S. 1, 15 Sup. Ct. 508:

"Congress, in effect, says to an inventor seeking to enjoy the exclusive use in this country of his invention for the full term prescribed by law: 'If your invention has not been introduced into public use in the United States for more than two years, you may, upon complying with the conditions prescribed, obtain an American patent, and you may, if you can, obtain a foreign

patent; but the American patent will be granted on the condition that, if you obtain the foreign patent first, your invention shall be free to the American people whenever, by reason of the expiration of the foreign patent, it becomes free to the people abroad.' "

In construing this section the meaning of the words "expire" and "term" is controlling. Section 4887 makes the American patent "expire" at the same time with the foreign patent, or, if there be more than one, at the same time with the one having the shortest "term." The supreme court of the United States, in one of the few cases on this point, construe this word "expire" to mean cease to exist because of the termination of the duration of the original grant, and not to mean cease or determine by reason of some penalty or forfeiture for the nonperformance of some condition subsequent. Pohl v. Brewing Co., 134 U. S. 381, 10 Sup. Ct. 577. "Under section 4887, Rev. St., a United States patent runs for the term for which the foreign patent was granted without reference to whether the latter patent became lapsed or forfeited in consequence of the failure of the patentee to comply with the rquirements of the foreign law." The court quotes Oakley v. Schoonmaker, 15 Wend. 226; Beach v. Mixon, 9 N. Y. 35; Farnum v. Platt, 8 Pick. 339,— as authority for construction of the phrase "expiration of the term." "In those cases it was held that the words 'expiration of the term' do not mean expiration of term through a breach of a condition, but mean expiration by lapse of time." This is in accord with the circuit cases quoted. Thus, in Holmes, etc., Protection Co. v. Metropolitan Burglar Alarm Co., 21 Fed. 458, Judge Wheeler held that section 4887 meant that the term of the United States patent should be as long as the remainder of the term for which the foreign patent was granted, without reference to the incidents occurring after the grant of the foreign patent; that that section referred to the fixing of the term of the foreign patent, and not to the keeping of it in force; that the term of the United States patent was not affected by the fact that a prior English patent had been suffered to lapse by the nonpayment of a tax. So, also, in Paillard v. Bruno, 29 Fed. 864, Judge Wallace held that under section 4887 a United States patent for an invention which had been previously patented in England for 14 years did not expire until 14 years from the date of the English patent, notwithstanding that the grant of the latter patent had terminated by the failure of the patentee to pay a stamp duty required to be paid as a condition of the continuance of the grant beyond the term of 3 years. Mr. Justice Bradley, on circuit, in Bate Refrigerating Co. v. Gillett, 31 Fed. 809, held that when an English patent was granted for a term certain, provided that, if the patentee should not pay a stamp duty within a certain time, the patent should cease and determine, a United States patent afterwards granted for the same invention was not affected by a forfeiture of the foreign patent subsequently incurred by a failure to perform such condition; that the term of the English patent fixed the term of the United States patent; that the subsequent fate of the English patent had no effect upon the United States patent, and that the life

of each, after its inception, proceeded independently of the life of the other. He quotes with approval the other circuit court cases, and he, with them, is quoted with approval by the supreme court.

What, then, is the term of these Canada patents? Evidently, from these cases quoted above, the contract in the grant of the patent between the government and the patentee is that the life of the patent shall be governed by the term originally granted to him by the foreign patent, notwithstanding any premature termination thereof by nonperformance of conditions subsequent by him. The grant of the United States looks to and is governed by the foreign patent as it is at the time of the issue of the United States patent. The corollary from this is that the contract between the United States and the patentee is unaffected by subsequent legislation in the foreign country. Mr. Justice Bradley, in the same case of Bate Refrigerating Co. v. Gillett, 31 Fed. 813, quoted above, speaking with reference to the act of 1872 and to the subsequent act of 1883, repealing it, says:

"I may say at once that I attach no importance to the last-mentioned act (1883). The American patent received its operative force and effect on the day it was issued, and no subsequent legislation, in Canada or elsewhere, could change it, whatever may be the effect of such legislation where made. The force and effect of the American patent could only be affected by the Canadian patent as the latter stood when granted, and not as afterwards modified by legislation."

The term of the Canada patents must be found in the act of 1872, under which they were issued. The express language of these patents fixes the term of each at five years. But, as the act of 1872 enters necessarily into and forms a part of the grant, the privilege is secured to the patentee to tack onto his term of five years another term of five years more, and yet another term of another five years, by performance within each term of five years of a condition precedent. It is a privilege, and not a duty. The term is not forfeited, but expires. Each duration of five years is a term independent. This clearly appears from the language of the act of 1872 and that of the act of 1883, in pari materia. In its construction of this word "term" in relation to this same law of Canada in connection with section 4887, the supreme court of the United States hold that, whatever be the original term of the patent, if there be provision for its extension, and this extension be "a matter entirely of right, and at the option of the patentee," that is, it would seem, not a matter of contract or binding obligation. And by the exercise of this right on the part of the patentee the entire protection of the foreign patent "has been continuous and without interruption." The United States patent does not expire until the foreign patent, with all of its renewals, so secured, has expired. This seems to be the result of Refrigerating Co. v. Hammond, 129 U. S. 151, 9 Sup. Ct. 225, as limited and explained in Pohl v. Brewing Co., 134 U. S. 381, 10 Sup. Ct. 577:

"There [in Refrigerating Co. v. Hammond] a United States patent was granted in November, 1877, for seventeen years. A patent for the same invention had been granted in Canada to the same patentee for five years from January, 1877. The Canadian patent was extended in 1881 for five years from January,

1882, and also for five years from January, 1887. under a Canadian statute passed in 1872. The question involved was whether, under section 4887, the United States patent expired in January, 1882, or January, 1892. The court, limiting itself to the precise question involved, said that it was 'of opinion that, in the present case, when the Canadian statute under which the extensions of the Canadian patent were granted was of force when the United States patent was applied for, and where, by the Canadian statute, the extension of the Canada patent was a matter entirely of right at the option of the patentee, on his payment of a required fee, and where the fifteen-years term of the Canadian patent has been continuous and without interruption, the United States patent does not expire before the end of the fifteen-years duration of the Canadian patent.' This was said on the view expressed elsewhere in the opinion that the Canadian patent did not expire, and it never could have been said that it would expire, before January, 1892. The ground of this conclusion was that the term of the Canadian patent granted in January, 1877, was by the Canadian statute at all times of 15 years' duration, made continuous and uninterrupted by the action of the patentee as a matter of right at his own option."

Evidently the learned justice who delivered the opinion of the court was construing the word "expire," and he was of the opinion that, although the original term of the patent was five years, yet the Canadian statute secured to him, as a matter of right, the privilege of renewing and extending the term, entirely, however, at his own option. So, when he exercised such right, the term did not in fact expire. In the case before him the patentee, of his own option entirely, had exercised his right. His term did not expire, but was so made continuous until his right had expired; the original term of 5 years having thus been converted into a continuous term of 10, and then of 15, years. Thus, under our law, he enjoyed the benefit of his monopoly in this country for 15 years, during which period the mischief could not arise against which the section 4887 was directed, the untrammeled use by foreigners of an invention protected by a United States patent. The question in every case is, when does the term of the foreign patent expire, looking to its language when issued? In Pohl v. Brewing Co., supra, the case was made against a person holding two foreign patents and a subsequent American patent. Of the two foreign patents, one granted in Germany had the shortest term. It was granted September 6, 1877, and its duration was until 12th December, 1891. Under the German law the patentee was required to pay certain annuities on the German patent, and to work the invention in the German empire on pain of forfeiture of his patent. Pohl neglected to do these, and in 1880 his patent was forfeited. The court, as has been seen, held that under proper construction of section 4887 the term did not expire until December, 1891, and that his rights under our section were not affected by his loss of his foreign patent by reason of his nonperformance of the conditions subsequent; that is to say, the term of the original patent must expire by its own limitation, and not by subsequent forfeiture.

By examining the Canadian patents to Bonsack, it will be seen that the term of each patent is distinctly declared to be for five years. There were conditions of forfeiture within the five years, expressed in the patent. These were not incurred. By the law of Canada, at or before the expiration of this term of five years the patentee, if he chose, could get a renewal of his patent another

term of five years, by paying a certain sum of money, patent fees. This was a matter of right, entirely of his own volition and option. If he did not choose to do this, his patent expired because its term had expired. But nonaction did not involve a lapse or forfeiture of his patent. He had never put himself under any obligation, by contract or otherwise, to pay the additional sum of money. If he had failed to fulfill the conditions stated in the patent, if he had failed to put his invention into operation within two years, or had introduced a patented machine from abroad within twelve months, his patent would have been forfeited, and would have lapsed. But he did neither. He held his patent until the term fixed by law had expired by its own limitation. This marks the distinction between his case and the German patent of Pohl. The latter was forfeited because he failed to fulfill a positive duty enjoined upon him by statute or by contract. Apply to Bonsack's case the language of the supreme court in Refrigerater Co. v. Sulzberger, supra. That case says that section 4887 imposes a condition upon every applicant for an American patent who holds a prior foreign patent. That condition is: "If you have a foreign patent, our patent shall cease to protect you when, by reason of the expiration of the foreign patent, your invention becomes free to people abroad." At the time when this condition was imposed upon Bonsack his Canada patents would expire whenever, at the end of the periods of five years, exercising his absolute right, and entirely at his own option, he chose that they should expire. At that time the patents would have expired in 1886. Exercising his right under the conditions stated, he obtained a new term to expire in 1891. Knowing the conditions on which he held his United States patents, he, of his own volition, allowed the new term to expire in 1891, not to lapse nor to become forfeited. By his own act he made his invention free to people abroad. It became free thereupon to the people of this country. He lost the protection of section 4887.

Objection was made in the argument to the mode of proof of the expiration of the Canada patents (the letter of the deputy commissioner). But when, by our statute, the American patent is limited to the term of the foreign patent, and as, in this case, the foreign patent in express language fixes the term at five years, the burden is on the patentee to show that, notwithstanding this, the term has not expired. The precise question above discussed at length has not come before the supreme court. The conclusion has been reached with great reluctance, and is expressed with diffidence. For this reason an examination will be made into the question of infringement of these patents, assuming, for the sake of argument, that they are still of force.

### The First Bonsack Patent, No. 238,640.

The bill charges infringement of claims 6 and 7 of this patent. At the argument so much as relates to claim 6 seems to have been abandoned. The infringement of claim 7 is insisted upon. This claim is in these words:

"An endless belt, by passing through a tapering tube in continuation of an open trough having side guides for the belt, a tapering tube having a spiral

groove extending from one of the side guides of the trough, and a terminal section having its edges separated to form a flange, 'b,' to give access to the paste wheel, and then closed again, as and for the purposes described."

Commenting on this invention, it is said that the most important feature in which it is differentiated from the inventions of Emery and of Hook is that the endless belt passes through the tube-forming die or paper-wrapping device. The general features of Bonsack's tube-forming die or wrapping tube are substantially the same as those of the earlier Hook and Emery machines. But, as has been seen, the preponderance of the evidence leads to the conclusion that Hook's machine had an endless belt, which passed through the tube-forming die or paper-wrapping device. The circuit court of appeals of the Second circuit, speaking of this Bonsack machine, says:

It is "a commercially successful improvement on the Emery belt machine, its main difference being that the belt which underlies paper and filler passes with both through the wrapping mechanism. The minor particulars which are described in the claims which are in controversy are improvements in the specific rolling and wrapping devices. An open trough having side guides for the belt receives the filler; and belt, tobacco, and paper are conveyed into a former, which is a tapering tube having a spiral groove extending from one of the side guides to the end of the tube, where the edges of the tube lap past each other, so as to form a flange continuous with the spiral groove. The object of these particular devices is to perfect the folding and wrapping mechanism so that the edges of the tube, and the tube itself, while being pasted and folded, may be controlled and kept in place." 69 Fed. 335.

A careful examination of the testimony, both of complainant and of the defendant, does not enable me to see in the Briggs machine either an open trough having side guides for the belt or a tapering tube, or a spiral groove extending from one of said side guides. Nor can I see in the Briggs machine any equivalent devices for these.

### Bonsack's Second Patent, No. 247,795.

The infringement charged is as to claim 8, which is in these words:

"The combination, with a rotary cutting disk, the carriage conveying the same, and means for moving the carriage parallel to the feed of the cigarette, of a holder for the cigarette, mounted upon the same carriage, and means for projecting said holder and the cigarette toward the relatively stationary cutting disk, substantially as and for the purpose described."

The Briggs machine has all of these elements combined in the manner set forth in the claim, producing the same result, except that in the Briggs machine the cutting disk is moved to the cigarette, and not the cigarette holder to the disk. The question is, is Bonsack limited to a device by which the cigarette holder is moved to the cutting disk? In a case in the circuit court of appeals, First circuit (Reece Button-Hole Mach. Co. v. Globe Button-Hole Mach. Co., 10 C. C. A. 194, 61 Fed. 961) a similar question is discussed. The court says:

"With the aid of the doctrine of equivalents the courts are constantly ingrafting on specifications and claims what they do not contain, in the same sense in which the letter of ordinary instruments is required to contain matters on which the parties rely. To extend, in disregard of this fact, the rule against interpolations to any particular case, requires either that the patent

relate to such mere matters of form or detail so that interpretation by exclusion becomes just and reasonable, or that the specifications and claims be so phrased as in fact to contain a clearly-intended exclusion, or the equivalent thereof. * * * The defense claims that, on account of numerous expressions, to which we have referred, the patentee was limited to machines in which the frame travels and the plate remains at rest. It must be conceded that, taking these specifications and claims as a whole, they show that Reece had present in his own mind, at the time of his application, a machine with a movable frame and a fixed plate. But, if this were all there is of it, and if this is sufficient to establish the defense, the question arises, where does the doctrine of equivalents come in? The most important parts of the case at bar are within the four corners of the principles we have stated. The court has no doubt that Reece was the inventor of nearly everything, if not everything, demanded by the Reece Button-Hole Machine Co. in the case at bar, and was entitled to a patent therefor. And the question is whether, by reason of the peculiar phraseology of his specifications and claims as first drawn, or by reason of certain amendments during the progress of his application through the patent office, Reece, notwithstanding the rules of interpretation entitle him to a favorable construction, has limited himself to a mechanism in which the frame travels; or whether, if he has thus expressed the literal terms of his patent, he has further so limited himself as to deprive himself of the benefit of the law of equivalents with reference to a machine in all respects a copy of his actual invention, as shown in his patent, except as to the nonessential characteristic that the frame remains at rest and motion is given to the plate."

Construing this patent in a liberal spirit, and recognizing that Reece was the inventor of everything, or nearly everything, demanded, the court held that his patent was not limited as contended by defendant. Let us now see the circumstances surrounding this case. Bonsack was not the first inventor, nor was he the inventor of everything demanded, nor does his patent in question for the first time indicate the method described. Reciprocating knives, traveling longitudinally with and transversely across the article to be severed, were described in the Spencer patent, No. 106,883, granted 30th August, 1870, for cutting a continuous plug tobacco into definite lengths; and in a patent to Thomas F. Morrin, No. 175,136, 21st March, 1876, also for plug tobacco; and in a patent, No. 215,473, 20th May, 1879, to George S. Myers, for a similar purpose. So, also, in the first and second Emery patents, such revolving cutting disks are shown, and in the first Bonsack patent too. Bonsack recognizes this. He says in his specifications:

"Heretofore the cigarette has been cut off by moving the knife against the cigarette, which necessitates a quick movement of a heavy and cumbrous mechanism. Instead of moving the knife to the cigarette, 1 bring the cigarette to the knife by projecting the holder 'h' toward the disk, as shown in dotted lines, Fig. 6."

In his application his claim was in these words:

"The combination, with a rotary cutting disk, of an adjustable holder for the cigarette roll and mechanism connecting the said holder for projecting said cigarette roll against the cutting disk, instead of the disk against the cigarette roll, as and for the purpose described."

The patent office objected to this: "As stated, no invention was required. The means must be named." To meet this requirement it was amended as follows:

"The combination of the rotary cutting disk having a movement on its carriage parallel to the feed of the cigarette, and a holder for the cigarette,

mounted upon the same carriage, and made adjustable toward the cutting disk, to bring the cigarette laterally against the plate for cutting it into lengths, as described."

This again was objected to, and finally the claim was put in as it is before us:

"The combination, with the rotary cutting disk, the carriage carrying the same, and means for moving the carriage parallel to the feed of the cigarette, of a holder for the cigarette, mounted on the same carriage, and means for projecting said holder and the cigarette toward the relatively stationary cutting disk, substantially as and for the purposes described."

Now, when it is remembered that he claimed, as an improvement on methods existing already, that he brought the cigarette to the cutter, and so avoided the movement of a heavy, cumbrous machine, and that in his original claim and in the amendments to it he had the same idea, distinctly stated, the conclusion must follow that by reason of the phraseology of his specifications and claims as first drawn and afterwards amended he has limited himself to the mechanism which he describes, in which the cigarette holder travels to the knife, and not the knife to the cigarette.

The last point open for consideration is that which applies specifically to the present defendants. It does not affect the other parties charged with infringement, who have stipulated to abide the result of this suit. An action was brought by the present complainants against the present defendants and the Pollard or International Company, in which suit the same patents set up by complainants in this case were said to have been infringed. The result of this suit was that their patents were declared to be valid. Complainants contend that, as to these defendants, that question is res judicata. Defendants deny the right of complainants to set up this ground of estoppel in the evidence, they having failed to set it up in the pleadings. The conclusion reached in this opinion renders the discussion of this question unnecessary. Giving to the decree set up as an estoppel its full force, and, for the sake of argument, admitting it into this case, though not set up in the pleadings, it would defeat any objection these defendants now set up to the validity of the Bonsack patents. The defendants may be precluded from discussing this question, but the other question—whether the Briggs machine is an infringement of them—still remains; and that has been decided in the negative.

This case came on to be heard upon the pleadings, evidence, and exhibits. Considering the same, and the arguments of counsel thereon, it is ordered, adjudged, and decreed, that the bill be dismissed, with costs.